UNITED STATES DISTRICT COURT
DISTRICT OF RHODE ISLAND

C. A. NO.: 08-cv-00041-S

JOYCE WAGENMAKER, )
Plaintiff, )
)
v. )
)
AMICA MUTUAL INSURANCE COMPANY, )
Defendant/Third-Party Plaintiff, )
)
v. )
)
VITO VITONE, )
Third-Party Defendant. )

**MEMORANDUM OF LAW IN SUPPORT OF AMICA MUTUAL INSURANCE COMPANY'S MOTION FOR SUMMARY JUDGMENT**

## I. BACKGROUND

This insurance coverage dispute arises out of a motor vehicle accident which occurred in Cranston, Rhode Island on July 3, 2006. The parties have asserted claims for declaratory relief for the purpose of determining their respective rights and obligations under an insurance policy issued by AMICA Mutual Insurance Company ("AMICA") to Vito Vitone ("Vitone"). Vitone, who was operating his 1998 Chevrolet Corvette, and his passenger, Joyce Wagenmaker ("Wagenmaker"), allege that they sustained personal injuries as a result of a collision with an unidentified vehicle.

Wagenmaker commenced this action and asked the Court to determine and declare that she is entitled to Uninsured Motorist coverage under AMICA's policy. *Ex. 1, Plaintiff's Complaint*. In response, AMICA asserted claims for declaratory relief: a

counterclaim against Wagenmaker, *Ex. 2, Answer with Counterclaim,* and third-party claim against Vitone, *Ex. 3, Third Party Complaint*.

AMICA seeks a declaration that there is no coverage for the Wagenmaker and Vitone's claims because, several months before the July 3, 2006 accident, the Uninsured Motorist coverage for the 1998 Chevrolet Corvette was deleted from the insurance policy at Vitone's request. In other words, there was no Uninsured Motorist coverage in the policy for the 1998 Chevrolet Corvette at the time the motor vehicle accident occurred. Therefore Vitone, is not entitled to recover UM benefits and Wagenmaker must recover UM benefits from her own insurer, Safeco Insurance Company of Illinois ("Safeco").[1]

## II. <u>**DESCRIPTION OF MOTION**</u>

This is a Motion for Summary Judgment by which AMICA seeks a declaration that there is no coverage under its insurance policy for claims arising out of a July 3, 2006 motor vehicle accident, including, specifically claims asserted by Vito Vitone and his passenger, Joyce Wagenmaker, for Uninsured Motorist coverage. This Court must determine and declare that, as a matter of law, there is no coverage because several months before the accident Vito Vitone deleted and eliminated all coverages (except "Other Than Collision" coverage) for his 1998 Chevrolet Corvette. AMICA is entitled to summary judgment as a matter of law on its counterclaim, third-party claim, and plaintiff's claims, including, her claims for declaratory relief (Count I) and breach of contract (Count II).

## III. STATEMENT OF UNDISPUTED FACTS

1. AMICA first issued a Rhode Island Personal Automobile Policy (No. 941138-23YV) (the "Policy") to Vito Vitone and his wife, Linda Vitone in or about 1994. The effective dates for the policy were November 25, 1994 to November 25, 1995. *Ex. 4, Affidavit of Linda Detroia*.

2. The renewal date for the policy was November 25 and the Vitones renewed their Policy every year from 1994 through 2006. *Ex. 4.*

3. At all times, the Vitones' listed address on the Policy was 290 Sanctuary Drive in East Greenwich, RI 02818. *Ex. 4.* The Vitones never made any request to change this address prior to the July 3, 2006 accident.

4. AMICA sent written communications about the Policy to the Vitones at their listed address of 290 Sanctuary Drive in East Greenwich, RI. Written communications mailed to this address were not returned to AMICA as undeliverable. *Ex. 4*

5. At various times, the Vitones owned up to five (5) different vehicles which were listed on this Policy, including, a 1998 Chevrolet Corvette. *Ex. 4*.

6. In or about early October, 2005, in anticipation of the upcoming renewal date, AMICA sent a letter to the Vitones (at 290 Sanctuary Drive, East Greenwich, RI) with a copy of a proposed renewal policy which was to be effective from November 25, 2005 to November 25, 2006. *Ex. 4A, p. 46-95.* The proposed policy listed six vehicles in the Declaration Pages, including, the 1998 Chevrolet Corvette. *Ex. 4A, p. 59*. In the correspondence, the Vitones were asked to contact AMICA to make any changes to the policy. The Vitones were advised that "[c]hanges will be effective on the renewal date unless an earlier date is requested." *Ex. 4A, p. 46.*

7. On the morning of October 13, 2005, Vito Vitone contacted AMICA's Underwriting Department to discuss the renewal of his policy.

8. On October 13, 2005, Vitone spoke with Linda Detroia, a Senior Supervising Account Representative, concerning the upcoming renewal and requested several changes to the Policy. *Ex. 4*.

9. First, Vitone indicated that he wanted his son, Michael, to be a listed operator on the Policy. *Ex. 4B, p.97; Ex. 5, Statement of Vito Vitone (with transcription), p. 115-122.*

---

[1] In the companion case, the parties have asserted claims for declaratory relief for the purpose of determining their rights and obligations under an insurance policy issued by Safeco to Joyce Wagenmaker.

10. Secondly, Vitone requested the elimination of collision coverage for his 1999 Jeep. *Ex. 4B, p. 97*.

11. Third, Vitone said that he was selling his 2002 Lincoln and that it would be sold as of the effective date of the renewal. *Ex. 4B, p. 97.*

12. Fourth, Vitone stated that his 1998 Chevrolet Corvette was going to be taken off the road and stored in a garage by the renewal date (November 25, 2005). *Ex. 4B, p. 97.*

13. At that time, Vitone anticipated that he would not use the 1998 Chevrolet Corvette during the winter months and expected that the vehicle would be garaged at an auto care center in Pawtucket, RI for several months. *Ex. 5, p. 118.*

14. Vitone understood that he would not need liability or comprehensive coverage for the 1998 Corvette because it was to be garaged during the winter months. *Ex. 5, p. 118.*

15. During the telephone conversation with Ms. Detroia on October 13, 2005, Vitone requested that the elimination of all coverages for the 1998 Chevrolet Corvette except "Other Than Collision Loss" coverage. *Ex. 4.*

16. During the telephone conversation with Ms. Detroia on October 13, 2005, Vitone acknowledged that Liability, Medical Payments and Uninsured Motorists coverages for the 1998 Chevrolet Corvette would be eliminated. *Ex. 4.*

17. Lastly, during the October 13, 2005 conversation, Mr. Vitone also requested that we increase the deductible for the Collision coverage on his other vehicles from $500 to $1000 to save premium. *Ex. 4B, p. 97.*

18. Linda Detroia then processed the policy changes Vitone requested. At his request, all coverages (except "Other Than Collision" coverage) for the 1998 Chevrolet Corvette were deleted, including, the Uninsured Motorists Coverage. *Ex. 4.*

19. On October 13, 2005, Linda Detroia of AMICA sent the Vitones written confirmation of the elimination of coverages he had requested during our telephone conversation. *Ex. 4C, p. 99-104*

20. The October 13, 2005 letter was sent to the Vitones at their 290 Sanctuary Drive, East Greenwich, RI address. *Ex. 4C, p. 99.*

21. At that time, Vitone was living at 290 Sanctuary Drive address and receiving mail at the address as well. *Ex. 5*, *p. 116.*

22. In the October 13, 2005, letter, Linda Detroia of AMICA confirmed that AMICA endorsed his policy "to remove all coverage for the [1998 Chevrolet Corvette] except Other Than Collision Loss." *Ex. 4C. p. 100.*

23. In the letter, Ms. Detroia advised the Vitones to "[p]lease make certain to notify us before this vehicle is driven again to that we may make the appropriate coverage changes." *Ex. 4C, p. 100.*

24. The October 13, 2005 letter also included a "Coverage Confirmation" document that confirmed that Liability, Medical Payments, Collision Loss and Uninsured Motorists Coverage were "NOT COVERED" for the 1998 Chevrolet Corvette. *Ex. 4C, p. 101.*

25. Vitone received a copy of the October 13, 2005 letter. *Ex. 4C; Ex. 5*.

26. On October 14, 2005, AMICA's Underwriting Department also sent Vitone the Amended Declarations pages for the Renewal Policy. *Ex. 4D, p. 105 - 114.*

27. The Amended Declarations pages (with effective dates of November 25, 2005) were sent to the Vitones via regular mail to their listed address of 290 Sanctuary Drive in East Greenwich, RI 02818. *Ex. 4D, p. 106*.

28. The Amended Declarations confirmed that Uninsured Motorists Coverage did not exist and was "NOT COVERED" for the 1998 Chevrolet Corvette (listed as "Auto No. 5"). *Ex. 4D, p. 110.*

29. AMICA then issued the newly-endorsed renewal Policy with effective dates of 11/25/05 to 11/26/06. *Ex. 4; Ex. 4C and D.*

30. Effective on and after November 25, 2005 (and up to and including July 3, 2006), there was no Uninsured Motorists Coverage on the Policy for the Vitones' 1998 Chevrolet Corvette. *Ex. 4C and 4D.*

31. The Uninsured Motorists Coverage for this vehicle was deleted and eliminated at Vitone's request as of November 25, 2005. *Ex. 4.*

32. The Policy contained the following provision:

<u>UNINSURED MOTORISTS COVERAGE- RHODE ISLAND (PP 04 90 01 05)</u>

EXCLUSIONS

A. We do not provide Uninsured Motorists Coverage for bodily injuries sustained by any insured:

1. While occupying, or when struck by, any motor vehicle owned by that insured which is not insured for this coverage.

*Ex. 4A, p. 78*.

33. Vitone took the 1998 Chervolet Corvette out of the garage in 2006. *Ex. 5*.

34. Vitone never contacted AMICA to report that he had taken the 1998 Chervolet Corvette out of the garage or that he was driving the vehicle again. *Ex. 5*.

35. Vitone never contacted AMICA to request the reinstatement of the Liability, Medical Payments, or Uninsured Motorist Coverages for the 1998 Chevrolet Corvette at any time prior to July 3, 2006. *Ex. 4; Ex. 5*.

36. Vitone "goofed" when he failed to contact AMICA to reinstate full coverage on the vehicle. *Ex. 5, p. 119*.

37. Vitone was operating his 1998 Chevrolet Corvette in Cranston, Rhode Island on July 3, 2006.

38. At that time, the plaintiff/defendant-in-counterclaim, Joyce Wagenmaker, was a passenger in Vitone's vehicle.

39. On July 3, 2006, the 1998 Chevrolet Corvette was involved in a motor vehicle accident in Cranston, Rhode Island.

40. Vitone and Wagenmaker allege that they sustained personal injuries as a result of the July 3, 2006 motor vehicle accident.

41. Vitone and Wagenmaker have presented claims to AMICA for Uninsured Motorist benefits under Vitone's Policy.

42. AMICA properly denied coverage for Vitone and Wagenmakers' Uninsured Motorist claims because this coverage (and all coverages (except "Other Than Collision") had been removed from the Policy at Vitone's request in November 2005.

## IV. POINTS AND AUTHORITIES

### 1. AMICA IS ENTITLED TO SUMMARY JUDGMENT BECAUSE THERE WAS NO UNINSURED MOTORIST COVERAGE FOR VITONE'S 1998 CHEVROLET CORVETTE.

#### A. STANDARD OF REVIEW

Rule 56(c) of the Federal Rules of Civil Procedure sets forth the standard for ruling on a summary judgment motion:

> The judgment sought shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.

Fed. R. Civ. P. 56(c). Under Rule 56(c), the relevant inquiry is whether a genuine issue of material facts exists.Providence Journal Company v. Travelers Indem. Co., 938 F. Supp. 1066 (D.R.I. 1996); see Morrissey v. Boston Five Cents Savings Bank, 54 F.3d 27, 31 (1st Cir. 1995) (stating that a fact is "material" if it might affect the outcome of the case and a dispute is "genuine" if the evidence is such that a reasonable jury could return a verdict for the nonmovant). "Under Rule 56, once the moving party has made the preliminary showing that no genuine issue of material fact exists, the nonmoving party 'must contradict the showing by pointing to specific facts demonstrating that there is, indeed, a trialworthy issue.'"Providence, 938 F. Supp. at 1072 (quoting National Amusements, Inc. v. Town of Dedham, 43 F.2d 731, 735 (1st Cir.), cert. denied 115 S.Ct. 2247 (1995)). The First Circuit Court of Appeals has held, "the mere possibility that a factual dispute may exist, without more, is an insufficient basis on which to justify denial of a motion for summary

judgment." I.V. Services of America, Inc. v. Inn Development & Management, Inc., 182 F.3d 51, 55 (1st Cir. 1999) (quoting Posey v. Skyline Corp., 702 F.2d 102, 106 (7th Cir.1983)); see also Quinn v. Syracuse Model Neighborhood Corp., 613 F.2d 438, 445 (2d Cir.1980) ("The litigant opposing summary judgment ... must bring to the district court's attention some affirmative indication that his version of relevant events is not fanciful.")

The issues raised in this Motion for Summary Judgment are questions of law regarding coverage under an insurance policy issued by AMICA to Vitone. Therefore, the issues raised by AMICA are appropriate for summary judgment.

### B. AMICA PROPERLY DENIED VITONE AND WAGONMAKERS' CLAIMS BECAUSE UM COVERAGE WAS DELETED FROM THE POLICY AT VITONE'S REQUEST IN NOVEMBER 2005.

AMICA is entitled to summary judgment on all claims because Uninsured Motorist ("UM") coverage for Vitone's 1998 Chevrolet Corvette was deleted from his insurance policy prior to the July 3, 2006 accident. It is undisputed that Vitone contacted AMICA in October of 2005 and indicated that he was taking his 1998 Chervolet Corvette off the road. *Exs. 4 and 5.* It is also indisputable that Vitone requested that all coverages (except "Other Than Collision" coverage) be deleted for the 1998 Corvette. *Ex. 4*. At Vitone's request, the coverages, including, specifically, UM coverage, were deleted for the vehicle effective November 25, 2005. It is also undisputed that Vitone received written confirmation from AMICA that UM claims were "NOT COVERED" for the 1998 Corvette. *Ex. 4*. Accordingly, there is no basis

for Vitone or Wagenmaker to obtain UM benefits from AMICA in connection with the subject accident.

There are no "genuine" issues of disputed fact concerning the deletion of UM coverage for the 1998 Chevrolet Corvette. The elimination of this coverage was prompted when AMICA sent Vitone a copy of a proposed renewal policy in October 2005 and advised him to contact the company to make any changes. *Ex. 4A.* There is no dispute that Vitone contacted AMICA's Underwriting Department on October 13, 2005 to discuss changes to his policy, including, specifically, changes to the coverages for his 1998 Corvette. *Exs. 4 and 5.* At that time, Vitone spoke with Linda Detroia, a Senior Supervising Account Representative at AMICA with more than twenty-seven years of experience. It is undisputed that Vitone told Ms. Detroia that he was taking his 1998 Corvette off the road or garaging the vehicle. *Ex. 4.* Ms. Detroia's contemporaneous computer notes confirm that Vitone stated that the vehicle would be laid up and Vitone has acknowledged that he reported that the vehicle was to be garaged for the winter months. *Ex. 4B, Ex. 5.* Because his vehicle was to be taken off the road, Vitone requested the elimination of all coverages - except a coverage known as "Other Than Collision" Coverage. As the name implies, "Other Than Collision" coverage (or "OTC") provides limited coverage for losses that could occur when a vehicle - like Vitone's 1998 Corvette - is garaged or laid up, such as fire, theft or larceny. At Vitone's request, all coverages (except OTC) for the 1998 Chervolet were deleted, including, specifically, UM Coverage. *Ex. 4*. Effective on and after November 25, 2005, there was no UM coverage on the Policy for Vitone's 1998 Chervolet Corvette. *Ex.4.*

There is simply no merit to any suggestion that Vitone that he did not know or understand that the UM coverage had been deleted. *Ex. 5.* The uncontroverted affidavit of Linda Detroia demonstrates that Vitone requested the deletion of this coverage and acknowledged that it would be deleted at his request. *Ex. 4*. Moreover, AMICA mailed not one but two separate communications to Vitone which clearly documented the elimination of coverages for the 1998 Chevrolet Corvette. First, on October 13, 2005, Ms. Detroia wrote to Vitone and confirmed that the Policy had been changed to "remove all coverage for the [1998 Chevrolet Corvette] except Other Than Collision Loss."*Ex. 4C*. She also instructed Vitone to contact AMICA before the 1998 Corvette was driven again so that it could "make the appropriate coverage changes."*Ex. 4C.* In connection with the October 13 communication, AMICA also enclosed a "Coverage Confirmation" which clearly indicated that Uninsured Motorists (Liability, Med Pay and Collision) coverages were "NOT COVERED." *Ex. 4C.* Ms. Detroia's cover letter advised the Vitones to read the Confirmation pages carefully so "there will be no misunderstanding." *Ex. 4C*. Secondly, on the very next day (October 14, 2005), AMICA sent a further communication to Vitone which confirmed the elimination of the UM coverage. The Amended Declarations likewise documented that UM was "NOT COVERED." *Ex. 4D*. In light of the written communications from AMICA, there is no valid reason for Vitone to claim that he was not aware of the deletion of the UM coverage.

By mailing these communications to Vitone at his listed address, AMICA provided Vitone with proper and effective notice regarding the elimination of UM coverage. After all, under Rhode Island law, when an insurer mails a notice of

elimination to a named insured at the address shown on the insured's policy and can present proof of such a mailing, the notice of elimination is effective. Department of Business Regulation Insurance Division, Regulation XVI § 11(b); see Sparling v. Bizier, 778 A.2d 808 (R.I. 2001) (holding that insurer effectively canceled insurance policy after presenting un-rebutted evidence that notice of cancellation was mailed to the address shown on the policy); see also Trotta v. Pono, 360 A.2d 552, 556 (1976) (taking judicial notice of Department of Business Regulation Insurance Division, Regulation XVI). Department of Business Regulation Insurance Division, Regulation XVI § 11(b) provides:

> Proof of mailing of a notice of cancellation, reduction of limits, elimination of coverages or of intention not to renew or proof of the mailing of the reasons therefore, to the named insured at the address shown in the policy, shall be sufficient proof of the giving of notice and the giving of reasons required by this regulation.

Here, the elimination of the UM coverage was effective because AMICA mailed two separate communications to the address shown on the policy.

Additionally, it is noteworthy that Vitone has acknowledged that he received and reviewed communication(s) from AMICA in October 2005 concerning the policy changes he had requested.*Ex. 5*. His written statement contains references to his receipt of both a "communication in writing" (presumably, Ms. Detroia's October 13, 2005 letter) and an "amendment" (presumably, the Amended Declarations sent on October 14, 2005).*Ex. 5.* According to Vitone, although he reviewed the communication(s) and "noticed the premium change on the amendment," he could not recall if the document specified that the underinsured motorist coverage was removed. *Ex. 5*. Vitone's inability to recall the content of the two communications,

which clearly documented that UM coverage was "NOT COVERED," *Ex. 4*, cannot create a genuine issue of material fact. Put otherwise, this assertion alone is an insufficient basis on which to justify denial of a motion for summary judgment. See I.V. Services, 182 F.3d at 55 (deposition testimony, by the litigant opposing summary judgment, "that she did not remember receiving the Plan at best raises one possibility, among others, that a copy was never sent to her. That is not enough."); see also Cadle Co. v. Hayes, 116 F.3d 957, 960 (1st.Cir.1997) ("[E]stablishing a genuine issue of material fact requires more than effusive rhetoric and optimistic surmise."); Mack v. Great Atl. & Pac. Tea Co., 871 F.2d 179, 181 (1st Cir.1989) ("[the] evidence illustrating the factual controversy cannot be conjectural or problematic; it must have substance in the sense that it limns differing versions of the truth which a factfinder must resolve at an ensuing trial."); see generally Posey, 702 F.2d at 106 (holding summary judgment should be denied, even when plaintiff's affidavit hinted a question of fact existed, because Rule 56 demands that the party defending the motion show specific facts indicating that a genuine issue does indeed exist for trial).

In any event, it is illogical for Vitone to suggest that he wanted to eliminate liability and comprehensive coverages for the 1998 Corvette (because it was to be garaged for the winter) but somehow expected or believed that UM coverage would continue to exist for vehicle. There is no rational basis for Vitone to claim that UM coverage would or should exist for a vehicle that he intended to garage and take off the road. If, as Vitone acknowledged in his statement, he did "not need comprehensive or liability coverage since the Corvette was to be garaged," then the

same is true for UM coverage – a coverage like comprehensive and liability which is necessary only if the vehicle is regularly driven. *Ex. 5.* Vitone requested OTC coverage because the 1998 Corvette was to be garaged and there was no need to have any other coverage on the vehicle. The mere fact that Vitone "goofed" and operated the vehicle before contacting AMICA to reinstate coverage, should not resurrect a coverage which was properly deleted from the Policy. *Ex. 5.*

AMICA is entitled to summary judgment on all claims because UM coverage for the 1998 Corvette was deleted prior to the July 3, 2006 accident. AMICA is entitled to summary judgment on its counterclaim and third-party claim. Likewise, Wagenmaker cannot prevail on her claims, including, specifically her breach of contract claim (Count II), because AMICA properly denied coverage for her claim for UM benefits.

### C. VITONE IS NOT ENTILED TO UM BENEFITS BECAUSE HIS CLAIM IS BARRED BY EXCLUSION A.1 OF THE RHODE ISLAND UM ENDORSEMENT.

Vitone is also not entitled to UM benefits because his claim is barred by Exclusion A.1 of the "Rhode Island UM Endorsement." Ex. 4C. The exclusion reads as follows:

> We do not provide Uninsured Motorists Coverage for bodily injuries sustained by any insured:
>
> 1. While occupying, or when struck by, any motor vehicle owned by that insured which is not insured for this coverage.

*Ex. 6*; see generally Lumbermens Mutual Casualty Co. v. Hartmen, 1983 WL 481435 (RI Super. Ct. 1983) (the language of this exclusion is clear and unambiguous and

barred coverage for a UM claim). As outlined above, at the time of the accident, Vitone's 1998 Corvette was not insured for UM coverage. Thus, Exclusion A.1 bars coverage for Vitone's claim for UM benefits because the 1998 Corvette is a "vehicle owned by [Mr. Vitone] which is not insured for this [i.e. UM] coverage."

### D. AMICA WAS NOT REQUIRED TO OBTAIN A SIGNED ADVISORY NOTICE FROM VITONE BECAUSE RIGL 27-7-2.1 IS NOT APPLICABLE TO THIS LOSS.

It is anticipated that Vitone, Wagenmaker and/or Safeco may contend that the elimination of UM coverage is ineffective because Vitone never signed the "advisory notice approved by the Director of Business regulation concerning the hazard of uninsured and under insured motorists" referred to in RIGL § 27-7-2.1. This statute relates to the notice which is to be executed in circumstances where a named insured is purchasing the minimum compulsory liability limits and wishes to purchase a lesser limit of UM coverage. Specifically, the statute provides:

> Uninsured motorist coverage. (a) No policy ***insuring against loss resulting from liability*** imposed by law for property damage caused by collision, bodily injury, or death suffered by any person arising out of the ownership, maintenance, or use of a motor vehicle shall be delivered or issued for delivery in this state, unless coverage is provided in or supplemental to the policy, for bodily injury or death in limits set forth in each policy, but in no instance less than the limits set forth in Section 31-31-7 . . . , for the protection of persons insured under the policy who are legally entitled to recover damages from owners or operators of uninsured motor vehicles and hit-and-run vehicles . . . . The insurer shall provide uninsured motorist coverage ***in an amount equal to the insured's bodily injury liability limits***. The named insured shall have the option of selecting a limit in writing ***less than the bodily injury liability coverage***, but in no event less than the limits set forth in § 31-31-7, unless the

> named insured *is purchasing* only the minimum coverage required by compulsory insurance provisions of the general laws, in which case the limit can be reduced to zero, but only after signing an advisory notice . . ..

Section 27-7-2.1(a) (emphasis supplied).

There are several reasons why this portion of Section 27-7-2.1 and, in particular, the signed advisory notice requirement, is inapplicable to this loss.

First and foremost, the changes requested by Vitone entailed a *removal* of liability and UM coverages for the 1998 Corvette. Thus, the Policy, insofar as the 1998 Corvette was concerned, was not a "policy of liability insurance," which under Rhode Island statute must be "subject to a limit . . . of twenty-five thousand dollars ($25,000) because of bodily injury to or death of one person in any one accident, and subject to the limit for one person, to a limit of fifty-thousand dollars ($50,000) because of bodily injury to or death of two (2) or more persons in any one accident . . .." RIGL. § 31-47-2(A). Since the Policy (as modified at the request of Vitone) was not a "policy of liability insurance," it would also not be a "policy insuring against loss resulting from liability" for purposes of the UM statute, RIGL § 27-7-2.1, which provides that with respect to policies which *do* insure against loss resulting from liability that "[t]he insurer shall provide uninsured motorists coverage in an amount equal to the insured's bodily injury liability limits," and that "[t]he named insured shall have the option of selecting a limit in writing less than the bodily injury liability coverage, but in no event less than the limits set forth in § 31-31-7 [which refers to $25,000/$50,000 limits] . . . ." *Id.* In other words, RIGL § 27-7-2.1(a) does not apply because the subject Policy – as modified – was not a "policy of liability insurance." Simply put, the Policy provided no liability coverage.*Ex. 5.*

In considering the proper scope and application of RIGL § 27-7-2.1(a), it is impossible to ignore the express limitation contained in its introductory clause ("No policy insuring against liability..."). Any alternative interpretation of this provision would be violative of the principle of statutory construction, recognized in Rhode Island, that statutes are to be interpreted as a harmonious whole with no language treated as surplusage. State v. Caprio, 477 A.2d 67, 70 (RI 1984).

By mandating that UM coverage limits equal the insured's BI liability limits ("The insurer shall provide uninsured motorist limits in an amount equal to the insured's bodily injury limits"), Section 27-7-2.1 necessarily requires that the policy be a liability coverage policy to be affected by or bound by its terms. The language concerning the signed advisory notice is also premised upon the existence of a liability policy, and is therefore not applicable here. This reading is consistent with the observations of the Supreme Court of Rhode Island concerning the UM statute and overall statutory scheme concerning auto insurance in Rhode Island:

> . . . The General Assembly has chosen to protect the citizens of Rhode Island from uninsured or underinsured motorists by requiring motorists who drive here to obtain liability coverage and by requiring insurers *who issue automobile-liability policies* in this state to offer uninsured/underinsured motorist coverage to all insureds who obtain motor-vehicle liability insurance in Rhode Island. See § 27-7-2.1. . .
>
> \- - -
>
> To attain the legislative goal of assuring "that innocent victims of motor vehicle accidents may be recompensed for the injury and financial loss inflicted upon them," . . . [the General Assembly] also required insurers *issuing liability policies* in this jurisdiction to offer uninsured/underinsured motorist coverage to their insured customers.

Mendez v. Brights, 849 A.2d 329, 337 (R.I. 2004).

Secondly, the advisory notice requirement in Section 27-7-2.1(a) has been interpreted to apply to circumstances where the insured is, unlike the situation here, purchasing liability insurance in the first instance. In Ferreira v. Integron National Insurance Company, 809 A. 2d 1098 (RI 2002), the Rhode Island Supreme Court narrowly construed Section 27-7-2.1(a)'s written notice requirement and suggested that such notice was not necessary every time the insured renewed, altered or amended his policy. In Ferreira, the plaintiff argued that the defendant-insurer failed to obtain a written rejection of UM coverage when she was added as a named insured to an existing policy. The Court held that there was no requirement for a written rejection when the policy was amended. The Court also indicated that the insurer must only obtain a signed rejection of UM coverage only at the time an insurance policy is initially issued or delivered. Id.; see also Yelland v. Illinois Nat. Ins. Co., 2003 WL 21688584 (RI Super. Ct. June 18, 2003) (signed rejection only required when policy is initially issued). Here, Vitone was not purchasing insurance in the first instance but, instead, was simply renewing an existing policy. Accordingly, it was not necessary for AMICA to obtain a signed advisory notice.

### E. WAGENMAKER IS NOT ENTITLED TO UM COVERAGE MERELY BECAUSE THE 1998 CORVETTE WAS "A VEHICLE LISTED IN THE DECLARATIONS."

It is also anticipated that Wagenmaker will contend that she is entitled to UM coverage because the 1998 Corvette continued to be listed on the declarations page even after the UM coverage was deleted in November 2005. More specifically, Wagenmaker may claim that the 1998 Corvette qualifies as "a covered auto" for purposes of UM coverage because it is a "vehicle shown in the Declarations." Ex. 4A, p. 63. This contention is without merit because it is inconsistent with the express language of Policy (and, in particular, the Declarations pages) and Rhode Island law concerning policy and contract interpretation.

It is well established that an insurance policy must be examined in its entirety in order to determine the intent of the parties, and, if possible, to give it effect. Peloso v. Imperatore, 434 A.2d 274, 275 (R.I. 1981); see Providence Journal Co. v. Travelers Indem. Co., 938 F. Supp. 1066 (D.R.I. 1996). Terms of an insurance policy that are clear and unambiguous must be applied as written.Russo, 641 A.2d 1304, 130 (R.I. 1994). Yet, when the terms of the policy are subject to more than one reasonable interpretation, then that language should be construed strictly against the insurance company.Bush v. Nationwide Mutual Ins. Co., 448 A.2d 782, 784 (R.I. 1982). A court should not, however, stretch its imagination in order to read ambiguity into a policy where none is present.McGowan v. Connecticut Gen. Life Ins. Co., 114 R.I. 582, 585 (1975); see Anglo American Ins. Co., Ltd. v. Shooter at India Point Inc., 959 F. Supp. 115 (D.R.I. 1997); Martinelli v. Travelers Ins.

Companies, 687 A. 2d 443 (R.I. 1996). When interpreting an insurance policy or any contract, all documents relating to them are to be, where possible, construed as a harmonious and consistent whole. McGowan v. Connecticut General Life, 110 R.I. 17, 19 (1972); see also Textron, Inc. v. Aetna Casualty and Surety Co., 638 A.2d 537, 539 (R.I. 1994).

In the instant case, the plain and unambiguous language of the Amended Declarations establish that UM was "NOT COVERED" for the 1998 Corvette. *Ex. 4D*. There is only one, plausible and rational interpretation of the Amended Declarations – namely, that UM coverage was eliminated for the vehicle. The Court should reject Wagenmaker's attempt to misconstrue the plain language of the Policy because it is entirely inconsistent with the expressed intent of the parties to the contract. Vitone requested the deletion of UM coverage and AMICA agreed to eliminate the coverage. The 1998 Chervolet continued to appear in the Declarations pages because it was insured for OTC only. It would be illogical to extend UM coverage to the 1998 Chervolet simply because it was listed in Declaration pages – especially where those same Declaration pages clearly state that such coverage does not exist for the vehicle.

It is worth noting that the denial of Wagenmaker claim against AMICA for UM benefits will not prevent her from obtaining compensation for her injuries. After all, she will be entitled to obtain UM benefits from her own insurer, Safeco Insurance of Illinois.

### F. THE MERE EXISTENCE OF A "FLAT RATE" PREMIUM FOR UM COVERAGE DOES NOT ENTITLE VITONE AND/OR WAGEMENMAKER TO UM BENEFITS.

Vitone and Wagenmaker may contend that the Court should create UM coverage (where it otherwise would not exist) because Vitone was charged a "flat rate" for UM coverage in his multi-vehicle policy.

However, any reliance upon the "flat rate" premium is misplaced because, as outlined above, UM coverage was deleted for the 1998 Corvette at Vitone's request. The fact that AMICA charged a "flat rate" premium for UM coverage is without consequence because Vitone requested the elimination of this coverage for his vehicle and the policy was changed to reflect the deletion of this coverage. The Policy was modified and UM coverage did not exist for the 1998 Corvette. The mere existence of the "flat rate" premium should not compel AMICA to provide UM coverage for all vehicles – especially, where the UM coverage was specifically deleted for a vehicle at the request of the insured. In other words, the "flat rate" should not nullify the policy modifications Mr. Vitone requested and obtained. The purpose of the "flat rate" was not to extend coverage to all vehicles owned by the insured – whether or not they were insured under or listed on the insurance policy.

The Court should also reject Vitone/Wagenmaker's argument concerning the "flat rate" premium because its premise – namely, that premium must always reflect risk - is fundamentally flawed. Contrary to their suggestion, the "flat rate" premium does not involve any inequity or windfall to AMICA. Instead, as will be discussed in further detail below, the "flat rate" approach was adopted (with guidance from

industry groups (ISO) and the State of Rhode Island) in direct response to stacking legislation and, in this context, AMICA contractually agreed to take on any heightened risk relating to additional vehicles without charging any additional premium.

AMICA (and other insurers) adopted the “flat rate” when the Rhode Island Legislature amended the UM statute, Section 27-7-2.1(i) to address inter/intra-policy stacking issues. The genesis of the “flat rate” approach was a 1985 decision of the Rhode Island Supreme Court entitled, Constant v. AMICA Mutual Insurance Co., 497 A.2d 343 (R.I. 1985). The Constant Court held that insureds were not entitled to stack UM benefits under two separate policies (for which two separate premiums where paid) because the policies had specific language prohibiting such stacking. Constant v. AMICA Mutual Insurance Co., 497 A.2d 343 (R.I. 1985). In response, the Legislature adopted the following amendment to RIGL Section 27-7-2.1(i):

> Whenever an insured has paid two (2) or more separate premiums for uninsured motorists’ coverage in a single policy of insurance or under several policies of insurance with the same insurance company, the insured shall be permitted to collect up to the aggregate amount of coverage for all the vehicles insured, regardless of any language in the policy to the contrary.

Section 27-7-2.1(i). To comply with the statute – and in order to prevent intra-policy stacking of UM benefits - AMICA adopted a “flat rate” premium approach for multi-vehicle policies.[2] Thus, there was one rate for a single car and then a higher

[2] The Supreme Court of Rhode Island has consistently held that the “flat rate” premium precludes intrapolicy stacking. For example, in Cardosa v. Nationwide Mutual Insurance Company, 659 A.2d 1097 (RI 1995), the Court held that in circumstances where a single premium is paid, regardless of the number of vehicles insured, no stacking of UM

rate for any policy with two or more vehicles. By adopting this "flat rate" approach AMICA agreed to take on any heightened risk associated with multi-vehicle policies without charging any additional premium for each vehicle added to the policy.[3] In other words, to prevent stacking, AMICA agreed to accept the increased UM risk associated with additional vehicles. Thus, in this context, there is simply no merit to Vitone/Wagenmaker's claim that the premium must be diminished (or reduced) when the risk is diminished.

## V. **CONCLUSION**

For the above stated reasons, AMICA respectfully requests that this Court enter summary judgment on its behalf, and, in so doing, determine and declare that:

1. there is no coverage under any insurance policy issued by AMICA, including the subject Policy, for any claims arising out of the July 3, 2006 accident, including, Uninsured/Underinsured Motorist claims submitted by Wagenmaker and Vitone;

2. AMICA properly denied any and all claims submitted by Wagenmaker and Vitone on account of the July 3, 2006 accident, including their Uninsured/Underinsured Motorist claims;

3. AMICA shall have no liability to Wagenmaker for the any of the claims contained in her Complaint;

4. AMICA shall have no liability to Safeco Insurance of Illinois in connection with claims submitted by Wagenmaker and Vitone.

---

coverage is allowed. The Court specifically noted that "[s]ince the 1987 amendment, insurance companies have begun charging a single premium for UMBI coverage regardless of the number of vehicles insured."Cardosa v. Nationwide Mutual Insurance Company, 659 A.2d 1097 (RI 1995). Likewise, in Bazar v. Pennsylvania General Insurance Co., 657 A.2d 1070 (RI 1995) and DePalma v. Metropolitan Property Insurance and Liability Ins. Co., 615 A.2d 1019 (RI 1992), the Court held that stacking of coverage was neither required by statute nor permitted by the policy in light of the fact that only a single premium was paid.

[3] Although this approach benefited AMICA (by precluding stacking of coverages), it also benefited insureds with cost savings that were not insignificant.

Respectfully submitted,
AMICA Mutual Insurance Company
By its attorney,

/s/ John A. Donovan III

John A. Donovan III
SLOANE & WALSH, LLP
Three Center Plaza, 8th Floor
Boston, MA 02108
(617) 523–6010/(617) 227–0927 – *fax*
jdonovan@sloanewalsh.com

**CERTIFICATE OF SERVICE**

I hereby certify that on this 14th day of August 2008, that the within was electronically filed with the Court using the ECF system. The following counsel of record are registered with the Court and will be served electronically through the ECF system and by regular mail, postage prepaid: David J. Oliveira, Esq., 155 South Main Street, Suite 305, Providence, RI 02903 and Todd D. White, Esq., Adler Pollock & Sheehan, P.C., One Citizens Plaza, 8th Floor, Providence, RI 02903; Mark P. Dolan, Rice Dolan & Kershaw, 72 Pine Street, Suite 300, Providence, RI 02903.

/s/ Debra Ito

Debra L. Ito

S:\VITONE, VIT0 AND LINDA - AM-970-1808\Pleadings\sjmemorandumoflaw.com.DOC