UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

| | | |
|---|---|---|
| JOYCE WAGENMAKER,<br>Plaintiff, | : | |
| v. | : | C.A. No.:08-cv-00041S |
| AMICA MUTUAL INSURANCE CO.,<br>Third-Party Plaintiff, | : | |
| v. | : | |
| VITO VITONE,<br>Third-Party Defendant. | : | |

**VITO VITONE'S CROSS-MOTION FOR SUMMARY JUDGMENT**

Now comes Third-Party Defendant Vito Vitone, pursuant to Rule 56 of the Federal Rules of Civil Procedure, and hereby moves this Court to enter summary judgment in his favor with respect to Third-Party Plaintiff Amica Mutual Insurance Company's Complaint seeking Declaratory Relief as to its obligations under an automobile insurance policy issued to Mr. Vitone. The grounds for Vitone's motion are set forth in the accompanying Statement of Undisputed Facts, the Affidavit of Vito Vitone, and the supporting memorandum of law.

Dated: September 15, 2008

Respectfully submitted,
Third-Party Defendant,
Vito Vitone,
By his Attorneys

/s/ Nicholas Mancini
Nicholas R. Mancini, Esq. #7100
nmancini@apslaw.com
Todd White, Esq. #5943
twhite@apslaw.com
ADLER POLLOCK & SHEEHAN P.C.
One Citizens Plaza, 8th Floor
Providence, RI 02903-1345
Tel: (401) 274-7200
Fax: (401) 351-4607

## CERTIFICATION

I hereby certify that on this 15th day of September 2008, the within was electronically filed with the Court using the ECF system. The following counsel of record are registered with the Court and will be served electronically through the ECF system and by regular mail, postage prepaid:

David J. Oliveira, Esq.
155 South Main Street, Suite 305
Providence, RI 02903

Mark P. Dolan, Esq.
Rice Dolan & Kershaw
72 Pine Street, Suite 300
Providence, RI 02903

John A. Donovan III, Esq.
Nicole J. Tedesco, Esq.
Sloane & Walsh, LLP
Three Center Plaza, 8th Floor
Boston, MA 02108

/s/ Nicholas Mancini

*465061_1*

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

| | | |
|---|---|---|
| JOYCE WAGENMAKER,<br>Plaintiff, | : | |
| v. | : | C.A. No.:08-cv-00041S |
| AMICA MUTUAL INSURANCE CO.,<br>Third-Party Plaintiff, | : | |
| v. | : | |
| VITO VITONE,<br>Third-Party Defendant. | : | |

**MEMORANDUM IN SUPPORT OF THIRD-PARTY DEFENDANT, VITO VITONE'S OBJECTION TO MOTION FOR SUMMARY JUDGMENT OF DEFENDANT AMICA MUTUAL INSURANCE COMPANY AND CROSS-MOTION FOR SUMMARY JUDGMENT**

Third-party Defendant Vito Vitone submits this memorandum of law in support of his Opposition and Objection to Third-Party Plaintiff Amica Mutual Insurance Company's Motion for Summary Judgment; as well as in support of his Cross-Motion for Summary Judgment with respect to Amica's Complaint for Declaratory Judgment. Amica's purported cancellation of Vitone's uninsured motorist coverage was invalid under state law because: (1) Amica failed to provide notice of the hazards of uninsured motorists as required under Rhode Island law; and (2) Vitone maintained liability coverage under the policy well in excess of the statutory minimum at all relevant times. In addition, because Vitone paid a multi-car premium for uninsured motorist coverage under his Amica policy, such coverage should be deemed to have been personal to him and applicable to his injuries. In light of the within arguments and authorities, Vitone submits

that he is entitled, as a matter of law, to uninsured motorist coverage for injuries sustained in his motor vehicle accident on July 3, 2006.

## INTRODUCTION

On July 3, 2006, Mr. Vitone ("Vitone") was seriously injured when he was struck by a hit-and-run driver while operating his 1998 Chevrolet Corvette on Rhode Island Interstate 95. The passenger in the Corvette, Ms. Joyce Wagenmaker ("Wagenmaker"), also sustained serious injuries. When Vitone sufficiently recovered to report the accident to his insurer, Amica Mutual Insurance Company ("Amica"), an Amica representative advised him that he was not entitled to benefits under the "**UNINSURED MOTORISTS**" coverage of his Amica policy because the vehicle he was operating at the time of the accident was not insured for such coverage. As a result, Amica denied coverage for Vitone and Wagenmaker's injuries. Wagenmaker subsequently initiated this litigation against Amica by filing a Complaint seeking coverage for her injuries under Vitone's policy. In response, Amica filed a Third-Party Complaint for Declaratory Judgment against Vitone, asserting that his Amica policy did not provide coverage for his injuries. Accordingly, the precise question of law now before this Court is whether the Amica policy provides uninsured motorist coverage for the injuries sustained by Vitone and Wagenmaker in the July 3, 2006 accident.

## STATEMENT OF UNDISPUTED FACTS

### I. Undisputed Facts

1. Vito Vitone ("Vitone") was severely injured in a motor vehicle accident on July 3, 2006, while he was operating his 1998 Chevrolet Corvette on Interstate Route 95 in the City of Cranston, Rhode Island. *See* Exhibit A, Affidavit of Vito Vitone ("Vitone Aff."), ¶ 18, ¶ 21.

2. The subject accident was caused by an unidentified hit-and-run driver, who fled the scene of the accident and has never been identified. Vitone Aff., ¶ 19, ¶ 20.

3. Amica Mutual Insurance Company issued a "**RHODE ISLAND PERSONAL AUTO POLICY**" (Policy No. 961138-23YV) ("the subject policy") to Vitone and his wife, Linda Vitone, as named insureds, with an initial policy period of November 25, 1994 to November 25, 1995. The Vitones renewed the subject policy yearly through 2006. Vitone Aff., ¶ 3.

4. In October 2005, Mr. Vitone received from Amica a proposed renewal policy for the upcoming policy period of November 25, 2005 to November 25, 2006. Vitone Aff., ¶ 4; Counterclaim for Declaratory Judgment (Document No. 23), p. 6, ¶ 4.

5. The proposed renewal policy purported to provide "**LIABILITY**", "**MEDICAL PAYMENTS**", "**DAMAGE TO YOUR AUTO**" and "**TOWING AND LABOR COSTS**" coverage for the following six vehicles: 2000 Chrysler 300M; 1994 Mercedes-Benz E420; 2002 Lincoln LS; 1999 Jeep Cherokee; 1998 Chevrolet Corvette; 2005 Hyundai Tucson GLS. Vitone Aff., ¶ 4.

6. The proposed renewal policy purported to provide coverage for the November 25, 2005 through November 25, 2006 policy period consistent with the coverage provided during the prior policy period. Vitone Aff., ¶ 4, ¶ 6.

7. The proposed renewal policy purported to provide liability coverage for all six vehicles in the amount of $500,000 per each accident. Premiums applicable to each vehicle for said liability coverage were individually allocated and assigned to each of the six vehicles. Vitone Aff., ¶ 5.

8. The proposed renewal policy purported to provide "**UNINSURED MOTORISTS**" coverage for bodily injury in the amount of $500,000 per each accident in exchange for a total premium of $392. Vitone Aff., ¶ 6.

9. The premium payment with respect to the "**UNINSURED MOTORISTS**" coverage under the proposed renewal policy was not divided or allocated among the six vehicles; rather, a total premium of $392 for "**UNINSURED MOTORISTS – BODILY INJURY**" coverage was added to the sum of the individual premiums charged for the coverages on each of the six vehicles. Vitone Aff., ¶ 7.

10. The proposed renewal policy's "**DECLARATIONS**" page did not indicate that $392 premium for the "**UNINSURED MOTORISTS**" coverage was divided or allocated among the six vehicles. *See* "**DECLARATIONS**", attached as Exhibit 1 to Vitone Aff., at 2, 3.

11. In October 2005, Vitone advised Amica via telephone that he wished to make changes to the insurance coverage provided under the subject policy. Vitone Aff., ¶ 8.

12. In October 2005, in a telephone communication with an Amica underwriter, Vitone requested that Amica delete the comprehensive, collision, and liability coverage under the subject policy for the November 25, 2005 through November 25, 2006 policy period with respect to the 1998 Chevrolet Corvette and the 2002 Lincoln LS. Vitone Aff., ¶ 9; Counterclaim for Declaratory Judgment, (Document No. 23) p. 3, ¶ 10.

13. Vitone at no time requested that Amica delete, remove, or change the "**UNINSURED MOTORISTS**" coverage provided under the subject policy. Vitone Aff., ¶ 10.

14. Amica's underwriting file contains no notation reflecting any specific request by Vitone during that telephone conversation to remove, delete, eliminate, reduce, or in any way change the "**UNINSURED MOTORISTS**" coverage under the subject policy. *See* "Amica Record of Telephone Conversations," attached as Exhibit 4B (Document No. 34-7) to the Affidavit of Linda S. Detroia (Document No. 34-5), filed by Amica as an attachment to the Memorandum of Law (Document No. 34) in Support of its Motion for Summary Judgment (Document No. 32).

15. Notwithstanding the changes made to the subject policy in October 2005, Vitone maintained liability coverage in the minimum amount of $500,000 per each accident for four (4) of the six (6) vehicles listed under the subject policy for the November 25, 2005 through November 25, 2006 policy period. Vitone Aff., ¶ 16.

16. At no time did Amica provide Vitone with an advisory notice approved by the Rhode Island Department of Business Regulation concerning the hazard of uninsured and/or underinsured motorists. Vitone Aff., ¶ 13.

17. At no time did Vitone sign an advisory notice approved by the Rhode Island Department of Business Regulation concerning the hazard of uninsured and/or underinsured motorists. Vitone Aff., ¶ 14.

18. Following the October 2005 telephone conversation with the Amica underwriter, Vitone received a letter from Linda Detroia of Amica and a "Coverage confirmation" form, but did not understand the materials to indicate that the "**UNINSURED MOTORISTS**" coverage provided under the subject policy had been deleted or changed in any way with respect to the November 25, 2005 through November 25, 2006 policy period. Vitone Aff., ¶ 15.

19. Amica issued the subject policy for the November 25, 2005 through November 25, 2006 policy period and Vitone received an "**AMENDED DECLARATIONS**" page purporting to delineate the coverage provided under subject policy. Vitone Aff., ¶ 14.

20. Vitone did not examine the "**AMENDED DECLARATIONS**" page until after the July 3, 2006 accident. Vitone Aff., ¶ 23.

21. Following the July 3, 2006 accident, Vitone made a claim under the "**UNINSURED MOTORISTS**" coverage of the subject policy. Vitone Aff., ¶ 21.

22. Amica has denied coverage under the "**UNINSURED MOTORISTS**" coverage of the subject policy with respect to Vitone's injuries on the ground that Vitone removed the "**UNINSURED MOTORISTS**" coverage from the subject policy with respect to the 1998 Corvette in October 2005, and also on the basis of the "OWNED BUT NOT INSURED" exclusion of the "**UNINSURED MOTORISTS**" coverage. Vitone Aff., ¶ 22.

23. As of July 3, 2006, Vitone continued to maintain liability coverage for four (4) vehicles under the subject policy in the amount of $500,000 per accident. Vitone Aff., ¶ 26.

24. As of July 3, 2006, Vitone believed that the "**UNINSURED MOTORISTS**" coverage under the subject policy protected him, as a named insured under the subject policy, against loss caused by uninsured motorists regardless of the insurance status of the vehicle in which he was traveling at the time of the injury. Vitone Aff., ¶ 27.

25. Vitone at no time received any reduction or rebate on the premium applicable to the "**UNINSURED MOTORISTS**" coverage under the subject policy. Vitone Aff., ¶ 17.

26. The premium for "**UNINSURED MOTORISTS**" coverage under the subject policy was set as a multi-car premium. Vitone was advised by Amica following the July 3, 2006 accident that Amica provided premiums for "**UNINSURED MOTORISTS**" coverage on a single or multi-car basis. Vitone Aff., ¶ 28. Accordingly, there was no corresponding reduction in premium with respect to Vitone's alleged deletion of "**UNINSURED MOTORISTS**" coverage from the subject policy.

## ARGUMENT

Summary judgment is appropriate only where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). For Rule 56 purposes, the Court reads the record in the light most favorable to the non-moving party, drawing all reasonable inferences in that party's

favor. *Reich v. John Alden Life Ins. Co.*, 126 F.3d 1, 6 (1st Cir. 1997)). In that regard "an inference is reasonable only if it can be drawn from the evidence without resort to speculation." *Mulero-Rodriguez v. Ponte, Inc.*, 98 F.3d 670, 672 (1st Cir. 1996) (quoting *Frieze v. Boatmen's Bank*, 950 F.2d 538, 541 (8th Cir. 1991)). Where cross-motions for summary judgment are involved, "the court must consider each motion separately, drawing inferences against each movant in turn." *Reich*, 126 F.3d at 6. Cross-motions for summary judgment "simply require [the court] to determine whether either of the parties deserves judgment as a matter of law on facts that are not disputed." *Barnes v. Fleet Nat'l Bank, N.A.*, 370 F.3d 164, 170 (1st Cir. 2004).

## I. VITONE IS ENTITLED TO SUMMARY JUDGMENT BECAUSE AMICA COULD NOT REDUCE MR. VITONE'S UNINSURED MOTORIST COVERAGE TO ZERO UNDER RHODE ISLAND LAW

### A. Amica Could not Validly Reduce Vitone's Uninsured Motorist Coverage to Zero Under 27-7-2.1(a) Because It Failed to Secure His Acknowledgment of the Hazards of Uninsured Motorists.

Vitone is entitled to summary judgment in this matter because there is no disputed issue of fact, and no question, that Amica at no time secured the requisite notice required as a precondition under Rhode Island law before an insurance carrier may reduce an insured's uninsured motorist coverage to zero. As a result, "**UNINSURED MOTORISTS**" coverage is imputed to the Amica policy as a matter of law.

Even if Vitone sought to delete the "**UNINSURED MOTORISTS**" coverage under his Amica policy (which Vitone has steadfastly denied), Amica still failed to secure the acknowledgement necessary to eliminate his "**UNINSURED MOTORISTS**" coverage under Rhode Island law. Section 27-7-2.1 clearly states that in the circumstances in which reduction of

uninsured motorist coverage to zero is possible, an insurer can eliminate uninsured motorist coverage *only* after the named insured *signs* a specific notice acknowledging the risks of uninsured motorists. The statute provides, in pertinent part, as follows:

> The named insured shall have the option of selecting a limit in writing less than the bodily injury liability coverage, but in no event less than the limits set forth in § 31-31-7, unless the named insured is purchasing only the minimum coverage required by compulsory insurance provisions of the general laws, in which case the limit can be reduced to zero, *but only after signing an advisory notice approved by the director of business regulation concerning the hazard of uninsured and underinsured motorists*. That coverage shall also apply in the case of a responsible party whose liability insurance carrier was insolvent at the time of the accident or became insolvent subsequent to the accident. R.I.G.L. § 27-7-2.1(a) (Emphasis added.).

Under Rhode Island, when confronted with an issue of statutory construction, the court must "look to the plain and ordinary meaning of the statutory language." *State v. Greenberg*, 951 A.2d 481, 489 (R.I. 2008). "If the language is clear on its face, then the plain meaning of the statute must be given effect and [the] Court should not look elsewhere to discern the legislative intent." *Id.* "Moreover, 'when [the Court] examine[s] an unambiguous statute, there is no room for statutory construction and [it] must apply the statute as written.'" *Id.* (quoting *State v. DiCicco,* 707 A.2d 251, 253 (R.I. 1998)).

Section 27-7-2.1 is clear and unambiguous. Without question, the statute requires that an insurance carrier secure from its insured a signed advisory notice approved by the director of business regulation concerning the hazard of uninsured and underinsured motorists before the carrier can reduce his or her uninsured motorist coverage to zero. Obviously, in enacting this provision, the legislature's underlying objective was to ensure that the insured have actual

knowledge[1] of the dangers of canceling his or her uninsured motorist coverage, and give his or her informed consent, before an insurer can validly eliminate uninsured motorist coverage. Courts have recognized that where the requirement of a written offer and/or written rejection of uninsured motorist coverage is part of a particular state's statutory scheme, failure to provide the offer in writing or receive from the insured the requisite rejection in writing results in the uninsured motorist or underinsured motorist coverage being imputed to the policy as a matter of law. *See, e.g., Warford v. State Farm Mutual Automobile Ins. Co.*, 69 F.3d 860, 862 (8th Cir. 1995); *Moon v. Guarantee Ins. Co.*, 764 P.2d 1331, 1334 (Okla. 1988). Many courts have observed that requiring strict compliance with mandatory written offer/rejection statutes is the only sure and uniform way to avoid credibility contests over whether such an offer and/or rejection was actually made. *See, e.g., Estate of Ball v. American Motorists Ins. Co.*, 888 P.2d 1311, 1315 (Ariz. 1995).

Although Amica may bristle at the assertion, Vito Vitone never requested that the "UNINSURED MOTORISTS" coverage be deleted with respect to any vehicle on the subject policy, and Amica has no evidence to support a contrary contention. Moreover, the undisputed evidence shows that Amica never provided Vitone with the requisite department of business regulation advisory form necessary to reduce uninsured motorist coverage to zero under § 27-7-2.1. The evidence additionally shows that Vitone never executed the requisite department of business regulation form acknowledging the risks and hazards of uninsured motorists. Therefore, even if Vitone had undertaken efforts to cancel his uninsured motorist coverage, as Amica suggests (and which Vitone vehemently denies), Amica failed to secure the prerequisite

---

1 This is a significant point. Amica tries to establish in support of its Motion for Summary Judgment that Vitone had actual knowledge of the cancellation of his "**UNINSURED MOTORISTS**" coverage because he cancelled his liability and comprehensive coverage on the 1998 Corvette and was sent an Amended Declarations page. If this was sufficient to establish "actual knowledge," the Legislature would not require insurers to obtain signed advisory notices from their insureds. Amica wants to ignore the plain mandate of the law.

written acknowledgment necessary under § 27-7-2.1 to delete the "**UNINSURED MOTORISTS**" coverage provided under the policy. Consequently, Amica could not validly reduce Vitone's "**UNINSURED MOTORISTS**" coverage to zero under Rhode Island law.

In Amica's Memorandum of Law in Support of its Motion for Summary Judgment (Document No. 34), Amica cites the Rhode Island Supreme Court's decision in *Ferreira v. Integon National Insurance Co.*, 809 A.2d 1098 (R.I. 2002) in support of the contention that § 27-7-2.1's notice provisions do not apply when an insured renews an existing policy. Amica misreads *Ferreira*. There, the Court held that the defendant insurer did not have to obtain a written rejection of uninsured motorist coverage when the named insured *added* her husband to the policy because the addition of a party to the policy did not represent the "new issue or delivery" of a policy. In this case, however, Amica contends that Vitone changed his policy for the specific purpose of eliminating certain coverages from it, including "**UNINSURED MOTORISTS**" coverage. Amica admits that following those changes, it issued a new policy to the Vitones for the November 25, 2005 through November 25, 2006 policy period. The Affidavit of Linda S. Detroia even acknowledges that Amica issued a "newly-endorsed renewal policy" to the Vitones following the alleged changes to the policy in October 2005. *See* Affidavit of Linda S. Detroia, (Document No. 34-5), ¶ 10. This is precisely the factual scenario to which § 27-7-2.1 applies. Amica's interpretation of *Ferreira* would seemingly allow it to disregard its duty under § 27-7-2.1 any time an insured removed uninsured motorists coverage from an existing policy. This directly contravenes the Legislature's clear purpose to ensure that individuals are aware of the hazards of uninsured motorists before removing such coverage from their respective policies.

**B. <u>Amica Could Not Reduce Vitone's "UNINSURED MOTORISTS" Coverage to Zero under Rhode Island Law Because at All Relevant Times He Maintained Liability Coverage under the Amica Policy for Multiple Vehicles in an Amount Well in Excess of the Statutory Minimum.</u>**

Vitone is also entitled to summary judgment because there is no factual dispute that Amica could not permissibly delete Vitone's "**UNINSURED MOTORISTS**" coverage under R.I.G.L. § 27-7-2.1. Section 27-7-2.1 provides, in pertinent part:

> The insurer shall provide uninsured motorist coverage in an amount equal to the insured's bodily injury liability limits. The named insured shall have the option of selecting a limit in writing less than the bodily injury liability coverage, *but in no event less than the limits set forth in § 31-31-7, unless the named insured is purchasing only the minimum coverage required by compulsory insurance provisions of the general laws*, in which case the limit can be reduced to zero * * *. R.I.G.L. § 27-7-2.1(a). (Emphasis added).

This statute is clear and unambiguous. Pursuant to its terms, an insured can reduce his or her uninsured motorist coverage to zero *only if* the named insured has purchased the minimum liability coverage required by law. At all relevant times, Vitone carried liability coverage under Amica Policy No.: 961138-23YV for a minimum of four vehicles in an amount well in excess of the Rhode Island statutory minimum codified at § 31-31-7. There also is no dispute, however, that following his alleged cancellation or change of coverage in October 2005, Mr. Vitone retained liability coverage in the amount of $500,000 with respect to four vehicles for the November 25, 2005 through November 25, 2006 policy period. The statute clearly provides that an insured may only reduce uninsured motorist coverage to zero if the insured is purchasing the minimum coverage required by the compulsory insurance provisions of Rhode Island law. As Mr. Vitone maintained liability coverage for four vehicles well in excess of the statutory

minimum at all times relevant to this matter, Amica simply could not cancel his uninsured motorist coverage under § 27-7-2.1.

In its Memorandum of Law in Support of its Motion for Summary Judgment (Document No. 34), Amica asserts that § 27-7-2.1 does not apply to this case because Vitone removed liability insurance for the 1998 Corvette. Amica's argument purports to add a condition to the statute which simply does not exist. Section 27-7-2.1 unambiguously applies to "any policy insuring against loss for liability." It is undisputed that at all times pertinent to this matter, Vitone's Amica policy provided liability coverage for no less than four motor vehicles. Vitone's Amica policy therefore was without question a "policy insuring against loss for liability." Had the Legislature sought to mandate uninsured motorist coverage only if an insured purchased liability coverage for each and every vehicle he or she owned, it could have easily provided so in the text of § 27-7-2.1. As it did not include such language in the statute, this Court must presume that it did not intend to create such a condition, and that no such condition exists.

## II. VITONE IS ENTITLED TO SUMMARY JUDGMENT BECAUSE THE UNINSURED MOTORISTS COVERAGE UNDER HIS AMICA POLICY SHOULD BE DEEMED PERSONAL AND PORTABLE TO HIM IN LIGHT OF THE UNIQUE FACTS OF THIS CASE

### A. Amica's Denial of Coverage in this Case Violates Public Policy and the General Purposes of Uninsured Motorist Protection

Vitone is entitled to uninsured motorist coverage because Amica's denial of coverage in the circumstances presented by this case violates the public policy interests behind R.I.G.L. § 27-7-2.1, which favors compensation for victims of uninsured motorists and primarily aims to protect such victims from economic loss. Vitone contends that as a matter of law and public policy, the uninsured motorist coverage provided under his Amica policy should be deemed

personal and portable to him - rather than connected to the vehicle in which he was traveling at the time of his injury - because he paid a multi-car premium which was not decreased by Amica's deletion of coverage for his Corvette. Because Vitone carried both uninsured motorist protection and liability coverage under the Amica policy during the applicable policy period and paid the multi-car premium for "**UNINSURED MOTORISTS**" coverage under the policy, the public policy interests behind the Legislature's enactment of § 27-7-2.1 mandate that Amica provide him with uninsured motorist benefits for the injuries sustained in the July 3, 2006 accident.[2]

Section 27-7-2.1 of the Rhode Island General Laws mandates that insurers afford uninsured motorist coverage in any insurance policy which provides liability coverage. The statute provides, in pertinent part:

> "**Uninsured motorist coverage.**
>
> (a) No policy insuring against loss resulting from liability imposed by law for property damage caused by collision, bodily injury or death suffered by any person arising out of the ownership, maintenance or use of a motor vehicle shall be delivered or issued for delivery in this state with respect to any motor vehicle registered or principally garaged in this state unless coverage is provided therein or supplemental thereto * * * *for the protection of persons insured thereunder* who are legally entitled to recover damages from owners or operators of uninsured motor vehicles and hit-and-run motor vehicles because of property damages, bodily injury, sickness or disease, including death, resulting therefrom * * *." (Emphasis added).

[2] Amica erroneously claims that Vitone specifically deleted the "**UNINSURED MOTORISTS**" coverage on the 1998 Corvette and, as a result, claims that his claim for benefits is barred by the "owned-but-not-insured" exclusion applicable to the "**UNINSURED MOTORISTS**" coverage provided by the policy. Amica's denial limits the protection afforded to Vitone solely on the basis of the vehicle in which he was traveling at the time he sustained his injuries. Vitone's argument is that based upon the unique facts of this case, Amica's denial of coverage on this basis violates the public policy behind uninsured motorist protection.

The Rhode Island Supreme Court has recognized that the primary purpose of § 27-7-2.1 is to protect the named insured from uninsured tortfeasors. *Aetna Cas. & Sur. Co. v. Graziano*, 587 A.2d 916 (R.I. 1991). In enacting this section, the legislature intended that, as a matter of public policy, protection should be given the named insured against economic loss resulting from injuries sustained by reason of the negligent operation of uninsured motor vehicles or hit-and-run motorists. *Aldcroft v. Fidelity & Cas. Co.*, 259 A.2d 408 (R.I. 1969). Therefore, "provisions of insurance policies that restrict coverage afforded by the statute [are] void as a matter of public policy." *Sentry Insurance Co. v. Castillo*, 574 A.2d 138, 140 (R.I.1990).

Uninsured motorist coverage does not afford coverage to the uninsured motorist or the uninsured vehicle, but, rather, provides protection to the *insured* against the perils of injury by an uninsured motorist. 9 Couch on Insurance § 122:11 (July 2008). "Further, it must always be noted that [uninsured motorist coverage] is designed for the benefit of insureds and not insurers." *Id.* Consequently, a majority of jurisdictions have recognized that uninsured motorist coverage is a "first party" coverage which is personal and portable, following the insured, not a particular vehicle. 74 Am.Jur.2d *Automobile Insurance* § 314 (May 2008). Courts have recognized that:

> [T]he vast majority of jurisdictions have stated that the purpose in such uninsured motorist laws is to provide protection to innocent insured motorists and passengers injured as a result of the negligence of financially irresponsible drivers. * * * Its purpose is to give the same protection to the person injured by an uninsured motorist as he would have had if he had been injured in an accident caused by an automobile covered by a standard liability policy. *Rampy v. State Farm Mutual Automobile Insurance Co.*, 278 So.2d 428 (Miss. 1973).

Courts around the country have struck down efforts by insurance companies to deny uninsured motorist coverage to insured on the basis that he or she was injured while operating an uninsured vehicle. This majority has determined that such denials of coverage violate public policy and the

general purposes of uninsured motorist protection. Those courts generally recognize that uninsured motorist coverage is personal and thus protects insureds regardless of the vehicle in which he or she is injured. *See Hogan v. Home Insurance Company*, 194 S.E.2d 890 (S.C. 1973); *Mullis v. State Farm Mutual Automobile Ins. Co.*, 252 So.2d 229 (Fla. 1971); *Doxtater v. Sate Farm Mutual Automobile Ins. Co.*, 290 N.E.2d 284 (1972); *Travelers Indemnity Co. v. Powell*, 206 So.3d 244, 246 (Fla.App. 1968); *State Farm Mutual Automobile Ins. Co. v. Hinkel*, 488 P.2d 1151 (Nev. 1971); *Ellege v. Warren*, 263 So.2d 912 (La. Ct. App. 1972).

Commentators likewise have recognized that allowing insurers, such as Amica in this case, to deny uninsured motorist coverage to an insured simply because the insured was injured while traveling in a vehicle he or she owned but did not insure under his or her policy allows insurance companies "to withhold protection which would otherwise exist as a means of penalizing the claimant for owning and operating an uninsured vehicle—even though that status is completely unrelated to the claim under the uninsured motorist endorsement." Alan I. Widiss, A Guide to Uninsured Motorist Coverage § 2.9, at 28 (1969). Additional reasons support the general disfavor of such policy exclusions and denials:

> It is difficult to accept the propriety of such a restriction on coverage. First, the importance or value of the imputed business purpose for this exclusion seems tenuous as applied to the purchaser who owns more than one vehicle. Acquisition of insurance for a second vehicle is relatively inexpensive; therefore permitting the insurer to withhold coverage for the small return seems of dubious merit.* * * [I]nsofar as the uninsured motorist coverage is in theory predicated solely on the negligence of the unrelated uninsured motorist, there seems to be little reason to impose a limitation other than of fault. [Lastly], this exclusion directly conflicts with a strong public policy which favors indemnification of accident victims unless they are responsible for the accident.
>
> There seems to be a growing trend of decisions in which the courts have taken the position that such restrictions upon the coverage (so

> long as they are not specifically authorized by the state's uninsured motorist legislation) are against the public policy and therefore void. *Id.*

The Rhode Island Supreme Court has held that "[u]nder § 27-7-2.1, an insured is entitled to uninsured motorist coverage, unless he rejects it, but only so long as he has general motor vehicle liability coverage under a policy issued to him." *Murray v. Remuck*, 108 R.I. 179,184, 273 A.2d 491, 494 (1971). The Court has further held that the statute specifically provides coverage for "any person," including pedestrians,[3] and does not limit recovery to damages arising only out of the "use" of motor vehicles. *Sentry Insurance Co. v. Castillo*, 574 A.2d 138, 140 (R.I. 1990). The Court also has voiced a general disapproval of insurance policy provisions which restrict the coverage afforded by the statute as a matter of public policy. *See id.* at 140 (citing *Aldcroft v. Fidelity and Casualty Co.*, 106 R.I. 311, 319-20, 259 A.2d 408, 414 (1969)). Moreover, nothing in the text of § 27-7-2.1 limits the reach of uninsured motorist coverage to injuries suffered by an insured while occupying an uninsured motor vehicle.

The Legislature's purpose behind § 27-7-2.1 has been explained by the Court on several occasions. "The statute requires insurance carriers to provide protection for those claimants who voluntarily contract with licensed carriers for liability coverage as against uninsured operators." *DiTata v. Aetna Casualty and Surety Company*, 542 A.2d 245, 247 (R.I. 1988). "It thus protects those who have attempted to protect the public interest and themselves by purchasing insurance." *Id.* "Contracts for uninsured-motorist coverage, furthermore, must be construed in light of the public policy mandated by the Legislature." *Id.* "The primary object remains indemnification for

---

[3] One of the telling anomalies of this case is that if Vitone had been injured by an uninsured driver while he was walking alongside a roadway or while he was a passenger in any other vehicle, Amica would have no grounds upon which to deny his claim for uninsured motorist benefits for those injuries. This fact serves as an indication that uninsured motorist coverage is personal to the insured, rather than connected to any one particular vehicle, as Amica contends.

an insured's loss rather than defeat of his or her claim." *Id.* (citing 13 Appleman, Insurance Law and Practice § 7386 at 147 (1976)).

Vitone is mindful that notwithstanding these pronouncements, the Rhode Island Supreme Court has joined the minority of jurisdictions which enforce "owned-but-not-insured" exclusions and has refused to declare uninsured motorist coverage personal and portable to the insured. *Employer's Fire Ins. Co. v. Baker*, 119 R.I. 734, 383 A.2d 1005 (1978); *Nationwide Mutual Ins. Co. v. Viti*, 850 A.2d 104 (R.I. 2004). Vitone acknowledges that this Court has likewise denied such claims in light of its review of Rhode Island law, particularly the *Baker* decision, on the topic. *See Carlton v. Worcester Ins. Co.*, 744 F.Supp.395 (D.R.I. 1990). Vitone submits, however, that because of the unique facts of this case and the patent inequity that Amica's denial of coverage has created, the matter can be factually distinguished from those decisions (*Baker*, *Viti*, and *Carlton*) limiting the application of uninsured motorist coverage.

In *Baker*, the insured was covered under a policy issued by York in which a 1974 Ford Mustang was listed as the only insured vehicle. After the insured was injured while driving a van she owned but did not list on the policy, the Court upheld York's denial of uninsured motorist benefits. Rejecting the insured's argument that that coverage was personal to her, the Court adopted a vehicle-related interpretation of uninsured motorist coverage. In *Viti*, the insured was injured while operating a motorbike owned by the insured but not listed on his Nationwide policy. The Court refused to overrule *Baker* and denied coverage. Similarly, in *Carlton*, the insured was injured while operating an uninsured motorcycle. The subject policy listed two vehicles, but did not include the motorcycle. The District Court denied the insured's claims that the *Baker* decision was bad law, and enforced the policy exclusion.

Vitone submits that the facts of this case justify a deviation from the rule espoused in *Baker* and its progeny. Here, Vitone paid Amica an indivisible multi-car premium for "**UNINSURED MOTORISTS**" coverage under the policy for more than one vehicle.[4] When Amica, without authorization and approval from Vitone, deleted the "**UNINSURED MOTORISTS**" coverage from the policy with respect to the Corvette, the multi-car premium remain unchanged. Vitone did not receive a refund, premium return, or credit of any kind as a result of Amica's unauthorized cancellation of coverage on the Corvette. Consequently, for all intents and purposes, Vitone paid Amica for "**UNINSURED MOTORISTS**" coverage on the Corvette.

The concept that underlies the *Baker*, *Viti*, and *Carlton* decisions is that an insurance policy is a bargained-for contract. *See Baker*, 119 R.I. at 741, 383 A.2d 1008. Thus, an insurer should not be required to provide coverage where an insured unilaterally attempts to modify the contract by, for example, using a vehicle not listed on the subject policy. *See id.* The underlying rationale of this premise is that because the insurer did not calculate its risk, and therefore, its corresponding premium, based upon the insured's use of an unidentified vehicle, the insured should not be permitted to receive more coverage than that for which he or she and the carrier bargained.

In this case, however, because Amica utilizes either a single or multi-car premium for "**UNINSURED MOTORISTS**" coverage and Amica eliminated said coverage without Vitone's authorization, Amica has not and will not be prejudiced by providing coverage for Vitone's July 3, 2006 injuries. It is undisputed that the premium payment for "**UNINSURED MOTORISTS**" coverage under the policy would have been no different had Amica included the Corvette among

[4] There is no indication from the *Baker*, *Viti*, and *Carlton* decisions that the insureds paid a multi-car premium for uninsured motorist coverage during the relevant policy periods.

the vehicles for which such insurance was provided. Amica has thus refused to afford Vitone coverage in circumstances in which Amica would not have charged an additional premium attributable to such risk. Thus, while not remunerating any finances to Vitone for his alleged removal of such coverage for the Corvette (which Vitone denies), and while having the benefit of the entire multi-car premium (which Vitone paid), and thus decreasing its potential risk, Amica now refuses to pay when Vitone was the victim of an unidentified hit-and-run driver. This result clearly is inequitable and without question violates the purpose of § 27-7-2.1 by denying Vitone uninsured motorist protection for which he paid a premium. Consequently, Vitone submits that *Baker*, *Viti*, and *Carlton* decisions are distinguishable from the facts of this case, and that as a result he is entitled as a named insured to the "**UNINSURED MOTORISTS**" coverage afforded by the Amica policy.

## CONCLUSION

Because Amica's denial of "**UNINSURED MOTORISTS**" coverage for Mr. Vitone's injuries violates the mandatory requirements of Rhode Island's Uninsured Motorists Coverage statute and the public policy and purpose underlying its enactment, Third-Party Defendant, Vito Vitone, respectfully request that this Court deny Third-Party Plaintiff, Amica Mutual Insurance Company's Motion for Summary Judgment and grant his Cross-Motion for Summary Judgment with respect to the coverage issues raised by Amica's prayer for declaratory relief.

Dated: September 15, 2008

Third-Party Defendant,
Vito Vitone,
By his Attorneys

/s/ Nicholas Mancini
Nicholas R. Mancini, Esq. #7100
nmancini@apslaw.com
Todd White, Esq. #5943
twhite@apslaw.com
ADLER POLLOCK & SHEEHAN P.C.
One Citizens Plaza, 8th Floor
Providence, RI 02903-1345
Tel: (401) 274-7200
Fax: (401) 351-4607

**CERTIFICATION**

I hereby certify that on this 15th day of September 2008, the within was electronically filed with the Court using the ECF system. The following counsel of record are registered with the Court and will be served electronically through the ECF system and by regular mail, postage prepaid:

David J. Oliveira, Esq.
155 South Main Street, Suite 305
Providence, RI 02903

Mark P. Dolan, Esq.
Rice Dolan & Kershaw
72 Pine Street, Suite 300
Providence, RI 02903

John A. Donovan III, Esq.
Nicole J. Tedesco, Esq.
Sloane & Walsh, LLP
Three Center Plaza, 8th Floor
Boston, MA 02108

/s/ Nicholas Mancini

*460317_1*